UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FRANCES HOGAN, M.D.,<br><br>         Plaintiff,<br><br>    v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>         Defendant. | Case No. C14-1028RSM<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT |

## I.   INTRODUCTION

This matter comes before the Court on the parties' Motions and Cross-Motion for Summary Judgment. Dkts. #18, #19 and #26. The parties seek judgments as a matter of law with respect to an offset by Defendant Unum Life Insurance Company of America ("Unum") in disability insurance benefits. Having reviewed the record before it, and having found that oral argument is not necessary in this matter, the Court now GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion and Cross-Motion for Summary Judgment for the reasons discussed herein.

## II.   BACKGROUND

The sequence of events leading up to the matters at issue in this case are undisputed. Dr. Hogan is a psychiatrist, formerly employed by Group Health Permanente, P.C. ("Group Health"). Unum issued a group disability insurance policy to Group Health, Policy No.

ORDER
PAGE - 1

122917 002 ("the Unum Policy"), under which Dr. Hogan is covered. Dkt. #20, Ex. C and Dkt. #21, Ex. 1 at 6. Dr. Hogan applied for disability benefits under the Unum Policy in 2007. Unum found Dr. Hogan disabled as of January 5, 2007, and, following a 90-day "Elimination Period," began paying her disability benefits. Dkt. #21, Ex. 1 at 9 and Ex. 2 at 150.

In the same timeframe, Dr. Hogan also applied for disability benefits under a different disability insurance policy, which she had privately purchased in 1986 through the American Psychiatric Association ("APA Policy"). Dkt. #20, Ex. A and Dkt. #21, Ex. 2 at 61, 67-78 and 133. She was determined to be eligible for benefits under that policy as well, and she received $3000/month, also beginning in 2007. *See id.* at 98.

The Unum Policy allows Unum to reduce the monthly disability benefit it must pay by any amount the insured person receives that constitutes a "Deductible Source of Income." Dkt. #21, Ex. 1 at 24. The Policy defines "Deductible Sources of Income" to include benefits received under any "other group insurance plan." *Id*. It also identifies other income sources which are not "Deductible Sources of Income" and for which it will not reduce the benefit it must pay, including "franchise disability income plans." *Id*. at 25-26.

Dr. Hogan timely advised Unum of the APA policy, and that she had applied for and received benefits under it. Unum acknowledges that it received notice: "as early as 12/6/07 . . . the insured made us aware of the possible benefits under this group policy. Supp statements received 11/17/08, 2/6/10 and 6/28/13 noted the $3,000 benefit being received." Dkt. #21, Ex. 2 at 98. Between 2007 and 2013, Unum paid Dr. Hogan her full benefit under its policy, and did not deduct the amount provided under the APA Policy.

In March 2013, Unum assigned a new "Disability Benefits Specialist" to Dr. Hogan's claim, Jennifer Gurganus. Dkt. #21, Ex. 2 at 55-56. On May 22, 2013, Ms. Gurganus noted

ORDER
PAGE - 2

that Dr. Hogan had reported the APA policy was an individual disability policy, but "this was not verified with AIG." Dkt. #21, Ex. 2 at 58. Ms. Gurganus further observed that if Dr. Hogan's APA policy "is considered a group policy, it may be an offset to the [Unum] LTD policy." *Id.*

Ms. Gurganus requested a copy of the APA policy for review. Dkt. #21, Ex. 2 at 66 and 79-80. Ms. Gurganus reviewed the policy and entered a note stating "Based on my review, it appears that it is a group insurance plan and would be considered an offset." *Id.* at 81. She asked Unum "Offset Consultant" Andy Gaither for his opinion. Mr. Gaither responded that the APA policy "IS a Group Disability Policy and is documented in the policy. Therefore, any benefits received by the claimant under this policy ARE an offset to the LTD benefits payable under our LTD policy." Dkt. #21, Ex. 2 at 81.

Ms. Gurganus then wrote to Dr. Hogan on August 1, 2013, informing her that:

> . . . under some circumstances, your LTD policy provides for the reduction of your LTD benefits by those disability income benefits received from another group insurance plan.
>
> This letter shall constitute notification that your policy with the American Psychiatric Association serves as a reduction to your Long Term Disability benefits. We have confirmed that this policy was issued as a group policy.
>
> Beginning August 5, 2013, your monthly benefit will be reduced by your $3,000 benefit received from the American Psychiatric Association policy resulting in a gross monthly benefit of $478.64.

Dkt. #20, Ex. G and Dkt. #21, Ex. 2 at 84. Unum further requested a copy of Dr. Hogan's award letter so that it could determine whether "an overpayment on your policy has occurred." *Id.* Unum provided the same information to Dr. Hogan's attorney in September of 2013. Dkt. #21, Ex. 2 at 86-87.

ORDER
PAGE - 3

In October of 2013, Ms. Gurganus received confirmation from her legal department that the APA payments should have been deducted from the UNUM benefits because they were provided under a group policy, and was directed to "come to an amicable resolution regarding this back period." Dkt. #21, Ex. 2 at 90. On October 30, 2013, Unum informed Dr. Hogan's attorney that it had confirmed that the APA policy was a group policy and that it would be deducting the APA benefits from all future payments under the Unum Policy. Dkt. #21, Ex. 2 at 92. Unum further noted it would be contacting counsel shortly regarding the overpayment that had been occurring since 2007. *Id.* Unum also informed counsel that Dr. Hogan had the right to appeal. *Id.*

On January 24, 2014, Unum wrote to Dr. Hogan and informed her that it had erroneously overpaid her in the amount of $177,878.71 since she had been receiving disability benefits from January of 2007, but that it had "decided to waive part of the overpayment and [was] requesting $45,348.43 only." Dkt. #20, Ex. H and Dkt. #21, Ex. 2 at 100-101. Unum's internal notes reflect that because Unum had been on notice of the APA Policy since 2007, and because it had been continuously advised by Dr. Hogan of her receipt of benefits under the APA Policy, Unum was limited to pursuing all but the most recent 24 months of overpayment and would need to waive the remainder. *Id.* at 98-99.

Dr. Hogan appealed Unum's determination that her APA policy was a "group policy" and thus a "Deductible Source of Income" allowing Unum to reduce the monthly benefit it must pay her. Dkt. #21, Ex. 2 at 108-142. She focused on the portion of the Unum policy providing that income received from a "franchise disability income plan" was not a "Deductible Source of Income," and provided legal authority defining franchise insurance and showing that her APA policy fell within that definition. *Id.* at 108-113.

ORDER
PAGE - 4

On May 2, 2014, Unum denied Dr. Hogan's appeal. Dkt. #21, Ex. 2 at 145-149. Unum had confirmed its determination that the APA Policy was a group policy, and, as such, the benefits received under that policy were subject to deduction from the Unum benefits. *Id.*

Dr. Hogan has not reimbursed Unum for the alleged $45,348.43 overpayment. Consequently, Unum has been withholding the $478.64 per month to which Dr. Hogan would otherwise be entitled under the Unum Policy. Dkt. #28 at ¶ 8. Unum has been applying the amount withheld each month to the alleged overpayment. *Id.* at ¶ 9.

On June 10, 2014, Dr. Hogan commenced legal proceedings against Unum in King County Superior Court. Dkts. #1 and #6-1. In her Complaint, Dr. Hogan alleges that the APA Policy is a "franchise disability income plan," the benefits of which are not subject to offset under the Unum Policy. Dkt. #6-1.

Unum removed the matter to this Court. Dkt. #1. Unum has also filed a counterclaim against Dr. Hogan seeking its alleged overpayment of benefits and its attorneys' fees and costs. Dkt. #10.

The parties have agreed that disposition is appropriate on summary judgment. The primary question before this Court is whether the APA Policy constitutes a "franchise disability income plan" such that benefits received under the APA Policy are not subject to offset the Unum benefits.

### III.   DISCUSSION

**A. Defendant's Motion to Strike**

As an initial matter, the Court addresses Defendant's motion to strike Exhibits 3-7 to Plaintiff's counsel's declaration in support of her motion for summary judgment. Dkt. #26 at 23-24. Defendant argues that these exhibits are documents that were purportedly filed in

ORDER
PAGE - 5

different cases, some in different courts, in which Plaintiff's counsel did not represent any of the parties. *Id.* As a result, Defendant argues that Plaintiff's counsel cannot authenticate these exhibits and they are not properly before the Court. *Id.*

As the Ninth Circuit has noted, this Court may take judicial notice of court filings and other matters of public record, as such documents "are not subject to reasonable dispute." *See Reyn's Pata Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (citing *Glendale-Burbank-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998). This Court has also recognized documents filed in cases outside the Court. *Jones v. King County Jail*, 2014 U.S. Dist. LEXIS 95582, *2 (W.D. Wash. June 2, 2014) (citing *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) (district court "may take notice of proceeding in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue")). Accordingly, Defendant's Motion to Strike is DENIED.

**B. True Group Insurance v. Franchise Insurance**

As noted above, the primary question before this Court is whether the APA Policy constitutes a "franchise disability income plan" such that benefits received under the policy are not subject to offset the Unum benefits. Neither the Ninth Circuit nor this Court has analyzed what constitutes "franchise insurance." In fact, very few federal courts have. However, of those few, the Court finds several cases outside of this jurisdiction both relevant and instructive. In addition, this Court relies on *Couch on Insurance*, which the Ninth Circuit and this Court have recognized as a leading insurance treatise. *See Underwriters at Lloyds v. Denali Seafoods, Inc.*, 927 F.2d 459, 461 (9th Cir. 1991); *Akins Foods, Inc. v. Am. & Foreign*

ORDER
PAGE - 6

*Ins. Co.*, 2005 U.S. Dist. LEXIS 36765, *10 (W.D. Wash. Aug. 30, 2005) (referring to Couch On Insurance as the "leading treatise on insurance law").

Both the parties and this Court acknowledge that there are no cases, reported or otherwise, that discuss the term "franchise disability income plan." However, both *Couch* and the courts discuss "franchise insurance," and the parties appear to agree that the terms are synonymous. In comparing true group and franchise insurance, *Couch* notes:

> Group insurance is an arrangement by which a single insurance policy is issued to a central entity – commonly an employer, association, or union – for coverage of the individual members of the group. Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies. While franchise insurance avoids the three-party relationship that complicates group insurance, it multiplies the administrative burden for insurers and is not nearly as common as group insurance.

*Couch on Insurance* § 1:29 (3d Ed. 2002).

Other sources have noted:

> Group insurance is the coverage of a number of individuals by means of a single or blanket insurance policy.
>
> Franchise insurance affords a type of coverage having some similarities both to group insurance and to individual policies, whereby the governing entity of an association or other organization, by accepting a master policy, grants a franchise to the insurance company to solicit its members or other personnel and places a qualified stamp of approval upon the plan.

44 C.J.S. Insurance § 3.

The Third Circuit has discussed the differences between true group insurance and franchise insurance at length. Under similar circumstances, the court in *Fleisher v. Standard Insurance Company*, 679 F.3d 116 (3d Cir. 2012) determined that the policy at issue was a franchise policy. In that case, Robert Fleisher, D.M.D., filed suit against the Standard Insurance Company disputing Standard's decision to reduce Dr. Fleisher's monthly long-term

ORDER
PAGE - 7

disability ("LTD") benefits by the amount of the monthly benefits he received under a separate LTD insurance policy issued to him by the North American Company for Life and Health Insurance. *Fleisher*, 679 F.3d at 118. Dr. Fleisher disputed Standard's decision that the North American Policy constituted "group insurance coverage," and that the monthly payment he received under that Policy was therefore "Deductible Income" under the Standard Policy. *Id.*

The Court of Appeals agreed with the District Court's acknowledgment that "insurers use the term 'group insurance' to refer to 'at least two subsets of collective insurance products,' including 'true group insurance' and 'franchise insurance.'" *Fleisher*, 679 F.3d at 122-23. The Court continued:

> Under true group insurance policies, the certificate holder is typically an employee of the master policy holder, "all members or employees are automatically enrolled," and the master policy holder works directly with the insurer and is responsible for paying premiums, notifying the insurer about changes concerning which persons are covered at a given time, and submitting members' claims.
>
> Franchise insurance is also issued through a group which holds the master policy that provides for the general terms. While the master policy holder and insurer "'may negotiate' with the insurer to modify or terminate the plan, in all other respects the relationship between members and the insurer is 'precisely that of an insurer dealing directly with its policyholders.'" As the District Court explained:
>
>> [F]ranchise insurance generally has the following characteristics: (1) members of the relevant association or entity may enroll in the plan but are not required to do so; (2) members pay premiums directly to the insurer; (3) members make claims directly to the insurer; and (4) insurers agree to "waive underwriting, and take all applicants across the board."

*Fleisher*, 679 F.3d at 123 (citations omitted).

The Court then went on to review the District Court's determination that the policy at issue was franchise insurance:

ORDER
PAGE - 8

> The Court observed several features of the North American Policy consistent with franchise insurance, including that the Policy was "issued through a group, [the AAE], whose members could individually apply for coverage," and that "the members otherwise interacted directly with the North American regarding coverage and premiums." The Court also noted that "the Certificate, which [Fleisher] attaches to the Complaint, clearly states that it is issued pursuant and subject to 'group policy PG A320,' which is held by AAE, and that [Fleisher] obtained the Certificate as a member of the AAE." The Court acknowledged Fleisher's argument that the Policy "bears certain features characteristic of individual insurance policies," but concluded that the Policy can nonetheless be "reasonably characterized as a franchise policy."

*Fleisher*, 679 F.3d at 126.

In *Hummel v. Continental Casualty Insurance Company*, 254 F. Supp.2d 1183 (D. Nev. 2003), the Nevada District Court was required to analyze whether the insurance policy at issue was a true group insurance policy or a franchise insurance policy in order to determine which Nevada statutory provision was applicable to the legal issues raised. In answering that question the Court explained:

> The Nevada Supreme Court has endorsed the practice of re-classifying group policies as franchise policies when the circumstances so require. In *Daniels,* the insured, a veteran and retired postal worker applied for insurance in response to a nationally broadcast television commercial advertising low life insurance to qualified veterans of the United States armed forces. After approval, the insurance company sent Mr. Daniels a certificate indicating coverage under a group term life insurance policy. The master policy was delivered to the policyholder, United Missouri Bank of Kansas City, N.A., Trustee for the Veterans Group Insurance Trust. After a dispute arose over coverage, the state court was forced to decide whether the policy at issue was in fact true group coverage, or was actually a form of coverage known as "franchise insurance." The trial court found the policy to be group coverage, and granted summary judgment in favor of the insurer. In reversing the trial court and finding the policy to be "franchise insurance," the supreme court held that veterans of the United States armed forces is too diverse a group, and that true group policies usually involve "employees of a single employer, or a recognized professional organization such as the American Dental Association." The court's decision was also based on the fact that without an employer or an organization akin to an employer, there was no buffer to prevent "overreaching by the insurer …."

ORDER
PAGE - 9

> The determination as to the proper classification of Erica's insurance coverage is a question of law for the Court. Accordingly, the Court finds the insurance in this case more closely resembles the insurance at issue in *Daniels,* rather than a typical group policy provided by an employer. While Erica may have been an employee of Bank of America, she was offered the insurance not because of her employment status, but because of her status as an account-holder of a participating institution. Like veterans of the armed services, account-holders of "participating institutions" constitute an incredibly diverse group. Moreover, Continental has made no showing through affidavit or deposition that FSA provided any sort of buffer between Continental and its insureds, as would be the case with an employer. FSA's Constitution and Bylaws are insufficient evidence of FSA's participation in the procurement and continued administration of the accidental death and dismemberment insurance to convince the Court that Erica's policy is standard group insurance. Based on the evidence presented, the Court finds the insurance at issue is most appropriately described as "franchise insurance," and therefore, is governed by chapter 689A.

*Hummel*, 254 F. Supp.2d 1183, 1187 (D. Nev. 2003) (citations omitted).

In the instant matter, this Court finds *Fleisher* and *Hummel* persuasive. Dr. Hogan's policy was issued through a group, the APA, whose members could individually apply for coverage and were not required or compelled to do so. *See* Dkt. #21, Ex. 2 at 133. Dr. Hogan paid the premiums herself; she individually and directly enrolled; she submitted claims directly to the insurance carrier; a Certificate of Insurance was issued to her, identifying her as the Insured; and the master policy was issued to the APA, which then offered insurance to its members. *Id.* These factors convince the Court that the APA Policy constitutes franchise insurance.

Defendant relies on *Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614 (7th Cir. 2008) in support of its argument that the APA Policy is not franchise insurance. However, that case is inapposite. There, Dr. Gandhi Gutta, a laparoscopic surgeon who suffered from a variety of physical ailments, had come to the conclusion that he could no longer work in his

ORDER
PAGE - 10

chosen profession and filed for disability benefits under a group policy with Standard Select Trust Insurance Plans. *Gutta*, 530 F.3d at 616. Dr. Gutta received disability benefits from Standard for two years. At that point, in order to be eligible for continuing benefits under the plan, he had to show not just that he was unable to perform his own occupation, but that he was unable to perform any gainful occupation for which he is suited by education and experience. *Id.* Standard continued to pay benefits to Dr. Gutta for a third year while it investigated his eligibility under the latter, more stringent, criterion. It ultimately decided that Gutta was ineligible for continuing benefits because he was capable of working as a Medical Director. *Id.* Dr. Gutta disputed the determination. In a counterclaim before court the issue of franchise insurance arose, but the Seventh Circuit Court of Appeals did not analyze that issue. Rather, the Court of Appeals examined whether the policy constituted "any group insurance." *Id.* at 620-21. Thus, the Court finds the *Gutta* appeal uninstructive.

However, Defendant finds some support in the District Court's decision. *See Gutta v. Standard Select Trust Ins.*, 2006 U.S. Dist. LEXIS 65530 (N.D. Ill. Sept. 14, 2006). At that level, the Court examined whether the policy at issue was franchise or true group insurance:

> Franchise insurance exists when the insured contracts directly with the insurer and receives an individual insurance policy, while group insurance is characterized by a single policy issued to an organization so that organization's members can receive coverage. For group insurance, "[i]ndividual group members typically receive certificates proving they are insured and listing what coverage is provided."
>
> The record shows that Dr. Gutta received a "Certificate of Insurance" from Sentry Life. This certificate states that Dr. Gutta's coverage was obtained under "Group Policy No. 90-10613-47," which was issued to the AMA as the group policyholder. Dr. Gutta's Certificate of Insurance also states that it is "subject to all the provisions, definition, limitations and conditions" of Group Policy No. 90-10613-47. Thus, the Sentry Life policy certainly looks like a group policy.

ORDER
PAGE - 11

> The Seventh Circuit, however, has noted that matters are not necessarily this straightforward because a plan is not "group insurance" merely because it is issued to a group. Instead, "[f]ranchise insurance is a variation on group insurance, in which all members of the group receive individual policies." In this case, however, the court is reminded of the saying "if it looks like a duck and quacks like a duck it is a duck."
>
> The Sentry Life policy says it's a group policy insuring members of the AMA and contains a conversion provision which provides that under certain circumstances, the policy can be converted to "a guaranteed renewable individual disability policy." The court fails to see how the policy can be franchise insurance (*i.e.*, an individual policy issued to Dr. Gutta due to his membership in a group) when it states that it is issued to the AMA and envisions the possibility that under certain circumstances, the policy as to insured group members could be converted into an individual policy. If it was indeed an individual policy, it would be pointless to contain a provision allowing a group member to convert the policy to an individual policy. Accordingly, the court finds that the AMA policy is group insurance.

*Gutta*, 2006 U.S. Dist. LEXIS 65530 at *75-77 (citations omitted).

Defendant asserts that the *Gutta* decisions "dictate" that the APA Policy for Dr. Hogan is group insurance rather than franchise insurance. Dkt. #26 at 11. The Court is not persuaded. While Dr. Gutta's policy may have appeared to be a true group policy to the Northern District of Illinois, the same cannot be said of the policy held by Dr. Hogan. Indeed, as noted above, Dr. Hogan's policy has numerous characteristics of franchise insurance that distinguish it from true group insurance. Accordingly, this Court finds that Dr. Hogan's benefits received under the APA Policy may not be used to offset her benefits under the Unum Policy.

**C. Defendant's Counterclaim**

Because the Court has determined that Dr. Hogan's benefits received under the APA Policy may not be used to offset her benefits under the Unum Policy, the Court DENIES Defendant's counterclaim for its alleged overpayment of benefits to her. Moreover, the Court

finds that Plaintiff is entitled to her full benefits which have been withheld since her appeal was denied, and to her full benefits moving forward.

For the same reason, the Court DENIES Defendant's counterclaims for attorney's costs and fees.

## IV.    CONCLUSION

Having reviewed the parties' cross-motions for summary judgment, the responses thereto and replies in support thereof, along with all supporting declarations and exhibits and the remainder of the record, the Court hereby finds and ORDERS:

1. Plaintiff's Motion for Summary Judgment (Dkt. #18) is GRANTED.  Defendant is not entitled to offset her benefits under the Unum Policy by those benefits received under the APA policy.  Further, Plaintiff is entitled to her full benefits under the Unum Policy since the time they have been withheld and moving forward.

2. Defendant's Motion for Partial Summary Judgment (Dkt. #19) is DENIED.

3. Defendant's Cross-Motion for Summary Judgment (Dkt. #26) is DENIED.

4. This matter is now CLOSED.

DATED this 27 day of January, 2015.

_____
RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 13